

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,099

**ROBERT SPARKS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. F08-01020-VJ
### IN CRIMINAL DISTRICT COURT THREE
### DALLAS COUNTY

**COCHRAN, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

Appellant was convicted in December 2008 of capital murder for the stabbing deaths

of his two stepsons.[1]  Based on the jury's answers to the special issues set forth in the Texas

---

[1]TEX. PENAL CODE  § 19.03(a)(7)(A).

Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death.[2]   Direct appeal to this Court is automatic.  Art. 37.071, § 2(h).  After reviewing appellant's forty-seven points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

Appellant does not challenge the sufficiency of the evidence, but a brief statement of the facts is helpful for an understanding of his claims.  Appellant was charged with intentionally and knowingly causing the deaths of Raekwon Agnew[3] and Harold Sublet, Jr., by stabbing and cutting them with a knife, during the same criminal transaction.  The record shows that on September 15, 2007, appellant murdered his wife, Chare Agnew, and his 9- and 10-year-old stepsons, Harold and Raekwon, and he raped his 12- and 14-year-old stepdaughters, Garysha Brown and LaKenya Agnew.[4]  Some time after midnight, when everyone else in the house was asleep, appellant put his hand over Chare's mouth and stabbed her eighteen times as she lay in her bed.  He then went into the boys' bedroom.  As Raekwon lay sleeping, appellant woke Harold and took him to the kitchen, where he stabbed

---

[2] Tex. Code Crim. Proc. art. 37.071, § 2(g).

[3] The medical examiner testified that Raekwon's name appeared on his birth certificate as "Reakwon."  However, he is identified throughout the reporter's record and both parties' briefs as "Raekwon," and the prosecutor stated at trial that Raekwon's family had indicated that this was the correct spelling of his name.

[4] Subsequent references to the victims and their family members will be by first name because many of them share the same last name.

him at least 45 times.  He then woke Raekwon, took him to the kitchen, and killed him in the same manner.  Appellant dragged the boys' bodies to the living room and covered them with a comforter.  He then went into the girls' bedroom and woke LaKenya.  He pulled her out of bed at gunpoint, tied her up with bedsheets, and told her he had killed her mother and brothers.  He showed her their bodies and told her it was her fault they were dead.  Next, he woke Garysha and tied her up with electrical cords, and he tied a washcloth around her mouth.  He then told LaKenya that in order to save her and her sister's life, one of the girls would have to have sex with him.  LaKenya said that she would do it.  Appellant took her to the living room and raped her on the living room couch.

When he had finished raping LaKenya, appellant took Garysha to the living room and raped her on the couch, next to her sister.  Then, he made the girls stay in the bathroom with him while he took a shower.  He apologized to the girls for the rapes and murders.  He told them that their mother had been trying to poison him and that her death was their fault.  Next, he forced both girls to go with him into the garage, where he tried, unsuccessfully, to change the license plate on his car.  He took the girls back to the living room, where he lifted the comforter and showed the girls their brothers' bodies.  He remarked that Raekwon was stronger than he had expected him to be.  Appellant made the girls walk into their mother's bedroom and kiss her face, and then he put them into the bedroom closet.  He started a CD player and told them that help would come when the music ended.  He then locked the closet door and moved a dresser in front of it.  Finally, appellant left the house.

Appellant drove to his mother's house to borrow her car. He then drove to the home of his former girlfriend, Shunta Alexander, and their teenaged daughter, Brianna. He told Shunta what he had done. He gave her some money for Brianna and remarked that if there was a reward for catching him, Brianna should have it. Shunta begged him to call the police. Appellant called the police on his cell phone and briefly reported that he had killed his wife and two boys and he had left two girls locked in a bedroom closet. He provided the address and stated that he knew the police would trace the call if he stayed on the phone too long. He then hung up, broke his cell phone, and left Shunta's home. Later that morning, appellant's cousin drove him to the Greyhound bus station, where he bought a bus ticket under an assumed name and traveled to Austin.

Appellant returned to Dallas a few days later. He called a police detective and asked him if the police had found an audiocassette tape he had left in the house, which he believed contained a recording of Chare or one of the children admitting that they had been conspiring against him. He thought that this tape would help his case.[5] After his arrest, appellant made

---

[5] This tape consists of several segments in which the tape recorder was turned on and off. Some of the segments are appellant's conversations with Chare and/or one or more of the children, but none of them contains any admissions about anyone conspiring against appellant. In several segments, appellant expressed anger because he believed that the children were having sex with each other and that one of the girls was telling people that appellant had put a camera in the bathroom. He complained that illegal activity was taking place in the house and that he would be breaking the law if he did not report it. He threatened to call the police and have the children removed from their mother. In one segment, appellant complained about his car being damaged, and he demanded that Chare pay for the repairs. In yet another segment, he complained to some of the children about needing money for food and utilities, and he talked about pawning something.

(continued...)

a statement to police in which he requested testing for the presence of poison in his body, and he said that LaKenya and Garysha should be polygraphed about whether Chare had been poisoning him. He provided buccal, blood, hair, and fingernail samples to be tested for evidence of poisoning, but the lab that received the samples was not able to conduct the requested tests, and investigators were unable to locate a lab with that capability.[6]

## A.    Jury Voir Dire

In points of error one through seventeen, appellant complains that the trial court erred by denying the defense's challenges for cause to seventeen potential jurors. The record shows that appellant used a peremptory strike to exclude each of the challenged potential jurors. He exhausted all of his peremptory strikes and was granted two additional peremptory strikes. After the trial court denied his request for a third additional peremptory strike, appellant identified an objectionable juror whom he was forced to accept. Therefore, appellant preserved error.[7] However, because the trial court granted him two additional

---

[5](...continued)
During the final two segments, appellant spoke directly into the tape recorder. He stated that the earlier segments would be evidence of what "y'all" (presumably, Chare and the children) had been doing. He said that by the time the police found the tape, he would have killed Chare's sister, Nicole, and her boyfriend. Appellant asserted that if he died, the police should analyze the contents of his stomach, which would prove that "they" had been "putting shit in [his] food."

[6] A State's investigator testified that she watched the samples being collected and had them delivered to the Southwestern Institute of Forensic Sciences, but that lab was not able to test them for evidence of poisoning. Other labs around the country were contacted, but none of them was able to conduct the requested testing.

[7] *See Green v. State,* 934 S.W.2d 92, 105 (Tex. Crim. App. 1996).

peremptory strikes, appellant must show that the trial court committed error in denying his challenges for cause to three potential jurors to demonstrate that he was harmed. [8]

We look at the entire record of voir dire to determine if there is sufficient evidence to support the court's ruling on a challenge for cause. [9] We give great deference to the trial judge's decision because he is present to observe the venireman's demeanor and to listen to his tone of voice. [10] Particular deference is due when the potential juror's answers are vacillating, unclear, or contradictory. [11] In addition, "[w]hen the record is confused, and without a clearly objectionable declaration by the venireman, . . . we must defer to the trial court's understanding of what actually occurred." [12]

A potential juror is challengeable for cause if he has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely. [13] The test is whether the prospective juror's bias or prejudice would substantially impair his ability to carry out his oath and instructions in accordance with the law. [14] Before a

---

[8] *See Busby v. State,* 253 S.W.3d 661, 673 n.12 (Tex. Crim. App. 2008).

[9] *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[10] *Id.*

[11] *Id.; see also Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim. App. 1999).

[12] *Rachal v. State*, 917 S.W.2d 799, 814 (Tex. Crim. App. 1996).

[13] T EX. CODE CRIM. PROC. art. 35.16(a)(9) & (c)(2); *see also Gardner v. State,* 306 S.W.3d 274, 295 (Tex. Crim. App. 2009).

[14] *Feldman,* 71 S.W.3d at 744.

prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views.[15] To establish that the challenge for cause is proper, the proponent of the challenge must show that the prospective juror understood the requirements of the law and could not overcome his prejudice well enough to follow the law.[16]

Prospective jurors are not challengeable for their particular views about specific evidence.[17] The law does not require a juror to consider a specifically enumerated type of evidence as either mitigating or aggravating.[18] Therefore, a trial court does not abuse its discretion in overruling a defendant's challenge for cause based on a prospective juror's opinion that a particular type of evidence is not *per se* mitigating.[19] Indeed, a trial court does not abuse its discretion by disallowing questioning concerning a prospective juror's views about the mitigating value of particular evidence.[20] What is constitutionally required is that jurors must not be precluded or prohibited from considering any relevant evidence offered

---

[15] *Id.*

[16] *Id.*

[17] *Morrow v. State,* 910 S.W.2d 471, 472-73 (Tex. Crim. App. 1995).

[18] *Gardner,* 306 S.W.3d at 299-300.

[19] *Id.*

[20] *See Joubert v. State,* 235 S.W.3d 729, 734 n.23 (Tex. Crim. App. 2007).

in mitigation of punishment.[21] This requirement is satisfied so long as a defendant is allowed to present relevant mitigating evidence and the jury is provided a vehicle to give mitigating effect to that evidence, if the jury finds it to be mitigating.[22]

Appellant's first point of error concerns prospective juror Lawrence Allen. The record shows that, at the beginning of voir dire, Allen indicated that he generally favored the death penalty as an appropriate punishment for an intentional murder. However, when he was asked if, after finding a defendant guilty of capital murder, he could presume at the beginning of the punishment phase that the answer to the future dangerousness question should be negative, he replied that he would "have no problem with that." When Allen was asked if, after answering the future dangerousness question affirmatively, he could keep an open mind concerning the mitigation question, he again stated that he would "have no problems with that."

Defense counsel asked Allen if he thought that poverty would be a mitigating circumstance, and Allen replied, "Probably not." Counsel then asked Allen whether he would consider a mental defect to be mitigating. Allen answered, "I think I'd have to consider that. Any answer I give, it depends upon the circumstances taking place at the time of the trial, I think." At the conclusion of voir dire, defense counsel challenged Allen for

---

[21] *See Cordova v. State,* 733 S.W.2d 175, 189 (Tex. Crim. App. 1987) (citing *Eddings v. Oklahoma,* 455 U.S. 104 (1982), and *Lockett v. Ohio,* 438 U.S. 586 (1978), and rejecting the argument that the Constitution mandates that jurors give weight to any particular fact that might be offered in mitigation); *see also Rachal,* 917 S.W.2d at 813.

[22] *Raby v. State,* 970 S.W.2d 1, 3-4 (Tex. Crim. App. 1998).

cause on the ground that he was an "automatic death penalty juror," in that he would always answer the future dangerousness issue affirmatively and would not consider any mitigating factors, particularly poverty. The trial judge denied the challenge for cause.

On this record, we find no abuse of discretion. Regardless of his personal views, Allen affirmed that he could follow the law once it had been explained to him. Additionally, his statement that he did not think that poverty would be a mitigating circumstance did not make him challengeable for cause. Point of error one is overruled.

Appellant's second point of error concerns prospective juror Anthony Stephenson. The record reflects that the prosecutor explained to Stephenson that, if the defendant were found guilty and they moved to the punishment phase, the jurors would have to presume that the answer to the future dangerousness question would be no. Stephenson stated that he could make that presumption. He also stated that he could keep an open mind concerning mitigation. Later, defense counsel asked Stephenson whether, after he found a defendant guilty of a heinous capital murder, he would think that the defendant was a future danger. Stephenson responded, "Generally speaking, yes." Counsel then asked, "In that situation, when it comes to Special Issue Number 1 you're gonna always answer that in the way that would be yes, if you found someone guilty of capital murder, that they would be a future danger[]; is that right?" Stephenson responded, "I would say yes."

At the end of voir dire, counsel challenged Stephenson for cause on the ground that he would always answer Special Issue Number 1, the future dangerousness special issue,

affirmatively. The State asked that Stephenson be brought back for clarification on that point. The trial court then brought Stephenson back and questioned him:

Court: When [the prosecutor] was asking you questions, you understand that after you found a defendant guilty of a capital offense, then you proceed into the punishment phase of the trial, or punishment part of the trial?

Stephenson: Okay.

Court: You find out more evidence, and in going into that you would have to assume that the correct verdict before you heard anything from the state would be that a life sentence would be the appropriate sentence in the case.

Stephenson: Right.

Court: And then the state has to overcome that presumption, like the presumption of innocence, by proving to you beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence in the future. Or be a continuing threat to society.

Stephenson: Right.

Court: Kind of predicting the future, so to speak.

Stephenson: Okay.

Court: And what is your opinion? . . . After having found–if you find him guilty, then can you presume the appropriate sentence is a life sentence until the state–and have the state prove to you beyond a reasonable doubt of the future-dangerousness issue . . . before you would invoke the death penalty?

Stephenson: Yes.

Court: Or would you always, having found a person guilty of a heinous crime such as a capital-murder case, that you would always find [S]pecial

[I]ssue [1] yes, because if he killed two or more it was so heinous that you would always think that person would be a continuing threat to society?

Stephenson: No, I would not always think that.

Court: Okay. So you could make the state do their job, assume that a life sentence was an appropriate sentence, and then make the state prove to you, if they can, the future-dangerousness issue?

Stephenson: Yes.

Court: One other thing. Are you telling me you would or would not automatically find Special Issue Number 1, the answer to be yes?
Yes is the one that invokes the death penalty.

(Pause in proceedings)

Court: Have I confused you?

Stephenson: I have to say I would not always find yes.

Court: In other words, you could follow the law and make them prove Special Issue Number 1 to you before you would make that finding of yes.

Stephenson: Yes.

* * *

Court: Challenge for cause is denied.

Defense: Your honor, I have two things on the record. I did forget about the mitigation. He specifically indicated he would not consider poverty or education as a mitigating factor. We submit for cause on those, also.

Court: Challenge for cause is denied.

This record shows that Stephenson arguably gave inconsistent answers concerning the future dangerousness question. We afford particular deference to the trial court's

determination that Stephenson was not challengeable for cause on this basis. Further, Stephenson was not challengeable for cause based on his statements that he did not think that poverty and education were mitigating. Point of error two is overruled.

Appellant's fifth point of error concerns prospective juror William Triola. The record reflects that, when the prosecutor explained the penalty phase and asked Triola whether, after finding the defendant guilty, he could presume that the future dangerousness question should be answered negatively, Triola affirmed that he could do so. He stated that he would listen to all the evidence and keep an open mind before answering that question. Concerning mitigation, Triola stated that he would consider how the defendant lived his life, and what thoughts or reasons might have driven him to commit the offense.

Defense counsel examined Triola about his written questionnaire. In response to the question of whether some crimes, just because of their facts, called for the death penalty, Triola had written, "Premeditated murder or murder[] of an innocent person in the commission of a crime deserves the death penalty whether the [defendant] committed previous acts or not." When questioned about this response, Triola affirmed that that was how he felt, and he stated that he believed that someone who committed a premeditated murder "pretty much" deserved the death penalty. However, he also explained that those were his personal feelings, and he had not known about the applicable law and the penalty-phase questions until voir dire. He stated that, until the prosecutor explained the penalty

phase to him, he had believed that the jurors' job was done once they found a defendant guilty of premeditated or "first degree" murder.

Defense counsel asked Triola what he would want to know when he answered the special issues. Triola said that he would want to know about the defendant's past to make a decision concerning future dangerousness. He stated that a defendant's history of violent behavior for most of his adult life would indicate a probability that the defendant would commit future acts of violence. He also stated that he agreed with the presumption that a life sentence would be appropriate until the State proved future dangerousness.

Defense counsel explained that neither party had a burden of proof on the mitigation question. He asked Triola what would be important to him in considering the mitigation special issue, and Triola answered that a sufficient mitigating circumstance could be "almost anything." He affirmed that he would keep an open mind and consider whatever evidence was presented. When counsel asked for examples, Triola answered, "What might have happened to the defendant in the past would be possibly mitigating circumstances." Counsel asked him whether poverty or substance abuse would be mitigating circumstances. Triola replied that he did not think that they would be. He believed that physical abuse and possibly mental-defect evidence could be mitigating, but he stated that he would have to hear the evidence before he could make a decision. He stated that he would be open to testimony from a psychiatrist or psychologist.

Defense counsel then challenged Triola for cause on the ground that he was an "automatic death penalty juror," who would always find future dangerousness and who stated that someone who committed premeditated murder would deserve the death penalty regardless of any special issues on that point. Counsel also challenged him as being "mitigation-impaired" because he did not consider poverty and substance abuse to be mitigating factors. The prosecutor responded that Triola had stated that he would make the punishment decision based on the evidence and argument presented in the penalty phase, not just the facts of the offense, and that he had indicated he would listen to the evidence presented during each phase of the trial and give each step of the process due consideration. The trial court denied the challenge for cause.

On this record, we find no abuse of discretion. Triola indicated that he could set aside his personal feelings and follow the law concerning the special issues. Triola's statements that he did not think that poverty and substance abuse would be mitigating did not render him challengeable for cause. Point of error five is overruled.

Appellant's sixth point of error concerns prospective juror Myrna Conde. When questioned by the State, Conde consistently affirmed that, after finding a defendant guilty of capital murder, she would keep an open mind and follow the law with respect to the future dangerousness and mitigation issues. When questioned by defense counsel as to whether finding the defendant guilty would cause her to favor the death penalty, she initially responded, "If it was presented that the defendant did commit the crime[,] that the severity

of it was horrendous, the circumstances were premeditation, I believe that the State of Texas does impose the death penalty, I would be in favor of that." She then indicated that she did not mean to say that in such a case the State "imposes" the death penalty, but rather the State of Texas "allows" the death penalty. Defense counsel asked Conde several times whether, after finding the defendant guilty, she would presume that the defendant would be a future danger, and each time Conde affirmed that she would answer the future dangerousness question affirmatively. When counsel asked Conde if there was anything that she thought would be mitigating or important to her, she stated that there was nothing.

Counsel then challenged Conde for cause on the grounds that after having found someone guilty, she would always presume the defendant to be a future danger and she would not consider anything to be mitigating. The State responded that the way counsel had asked the questions had led Conde to give those answers. The trial court then called Conde back for additional questioning. The court again explained the phases of the trial and the law applicable to the punishment phase. Conde indicated that, after finding the defendant guilty, she would not presume that the future dangerousness question should be answered affirmatively, and she would keep an open mind and consider any mitigating circumstances. The court then denied defense counsel's challenge for cause. Counsel objected to the court's rehabilitation of Conde and re-urged his challenge for cause, which was again denied.

The record shows that Conde vacillated depending on who was asking the questions. When the law was explained to her, she affirmed that she would follow the law. In this

situation, we afford particular deference to the trial court's determination.[23]  Point of error

six is overruled.

Appellant's seventh point of error concerns prospective juror Peter Cavazos.  At the

conclusion of voir dire, appellant challenged Cavazos on the ground that he would always

answer the mitigation special issue in a way that the death penalty would result because he

would not consider poverty or substance abuse to be mitigating factors.  Cavazos's

statements that particular types of evidence were not mitigating to him did not render him

challengeable for cause.[24]  Point of error seven is overruled.

Appellant's eighth point of error concerns prospective juror Patrick Norton.  Norton

opined that, in general, the death penalty would be a just penalty for any murder.  However,

when questioned by the prosecutor, he affirmed that he would keep an open mind and follow

the law concerning the future dangerousness and mitigation issues.  When defense counsel

questioned Norton about his written responses to the jury questionnaire, he stated that his

own feelings were that if someone takes a life, his own life ought to be taken.  However,

Norton affirmed that, after the law had been explained to him, he would follow the law and

not prejudge the case.

Norton also stated that he would consider mitigating circumstances.  He

acknowledged that he had written on his questionnaire that background was "not an excuse"

---

[23] *See King v. State,* 29 S.W.3d 556, 568 (Tex. Crim. App. 2000).

[24] *Joubert v. State,* 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).

in assessing punishment, but he affirmed that, after he was made aware of the context for that question, he could "probably" take into consideration anything that would "be leading up to why [the defendant was] doing this crime." When counsel asked Norton whether he would consider poverty and education to be mitigating, Norton responded that they were not mitigating. Counsel also asked Norton whether he would consider a mental defect to be mitigating. Norton first stated that he was not sure, and then later he indicated that a mental defect would not be sufficiently mitigating. Defense counsel challenged Norton for cause on the grounds that he would always answer the future dangerousness question affirmatively after finding the defendant guilty, and he would not give any meaningful consideration to any mitigating factor.

Concerning future dangerousness, the record shows that Norton stated that he could set aside his personal views and follow the law. Concerning mitigation, Norton's statements that particular types of evidence were not mitigating to him did not render him challengeable for cause.[25] Point of error eight is overruled.

Appellant's ninth point of error concerns prospective juror Harold Wheeler. The record shows that, after the prosecutor explained the law concerning the special issues, Wheeler indicated that he would keep an open mind and follow the law. He said that he would presume a negative answer to the future dangerousness question until the State proved otherwise. The prosecutor pointed out that Wheeler had given a written response on the jury

---

[25] *Id.*

questionnaire, stating that mitigation is "never an issue" in a murder case. However, after the prosecutor explained the mitigation issue, Wheeler again confirmed that he would follow the law and keep an open mind.

During the defense's examination, Wheeler was somewhat less sure of his ability to set the defendant's guilt aside when considering the future dangerousness issue, but he continued to maintain that he would not always answer the future dangerousness question affirmatively, and that he would keep an open mind. Concerning the mitigation issue, Wheeler reiterated that he had not understood the law when he filled out the jury questionnaire, but he now understood the law and could consider mitigating evidence. When counsel questioned him about particular types of mitigating evidence, Wheeler stated that he was willing to consider mental illness as a mitigating factor.

At the conclusion of voir dire, counsel challenged Wheeler on the ground that he equivocated on the future dangerousness issue, was inclined to answer it affirmatively, and would not presume a negative answer, which effectively lessened the State's burden to prove future dangerousness. Counsel also challenged Wheeler on the ground that he would be unable to give fair consideration to mitigation, based on his written questionnaire answer that he did not think mitigation was appropriate in a murder case.

On this record, we find no abuse of discretion. After the law pertaining to the future dangerousness question had been explained to him, Wheeler indicated that he would set aside his personal feelings and follow the law. Although Wheeler wrote on his juror questionnaire

that mitigation was "never an issue," after the law was explained to him, he affirmed that he would follow the law and consider mitigating evidence. Point of error nine is overruled.

Appellant's tenth point of error concerns prospective juror Stacy Chadwick. The record reflects that at the beginning of voir dire, Chadwick indicated that she generally favored the death penalty. She stated that she did not have any problem with assessing the death penalty because, in her view, someone who made the decision to take the lives of others "brought [the death sentence] upon himself." However, after the prosecutor explained the penalty phase and the special issues to her, Chadwick indicated that she could presume that the appropriate sentence would be life without parole until the State proved the defendant's future dangerousness to her. Concerning mitigation, she stated that she could keep an open mind. She indicated that drug use would not be "an excuse" for committing an offense. She acknowledged that after finding a defendant guilty and also answering the future dangerousness issue affirmatively, she would have to see "something massive" to cause her to find sufficient mitigation in order to change the death sentence to life. She agreed, however, to listen to the evidence and keep an open mind. Her answers during the defense's examination were consistent with these responses.

At the conclusion of voir dire, defense counsel challenged Chadwick on several grounds: she was death-prone and would "equate finding of guilty with the result of death"; after an hour and a half of explaining, she still did not "seem to fully understand or appreciate

the mitigation scheme put in place by the legislature"; and she would not properly consider the mitigation question.

The record does not support appellant's assertion that Chadwick would "equate" finding guilt with a death sentence. Chadwick initially said that someone who killed someone else had brought the death penalty upon himself, but after the law was explained to her, she affirmed that she would set aside her personal feelings and follow the law concerning future dangerousness. Nor does the record support appellant's assertions that Chadwick did not understand or appreciate the mitigation scheme and would not properly consider mitigation. Chadwick's statements that drug use was "not an excuse" and that she would have to see "something massive" in order to find sufficient mitigation did not render her challengeable for cause.[26] Point of error ten is overruled.

Appellant's eleventh point of error concerns prospective juror Phillip Magee. Magee expressed the view that he did not think that poverty "in and of itself" could be sufficiently mitigating. He also stated that he did not think that mental illness "by itself" would be mitigating. At the conclusion of voir dire, counsel challenged Magee, asserting that he was "mitigation impaired" because he could not consider defendant's specific mitigators, specifically poverty and mental illness. However, Magee's statements that he did not think

---

[26] *See Gardner,* 306 S.W.3d at 299-300; *see also Saldano v. State,* 232 S.W.3d 77, 92-99 (Tex. Crim. App. 2007) (a potential juror who would place the mitigation burden on the defense is not challengeable for cause).

particular types of evidence were mitigating "by themselves" did not render him challengeable for cause.[27]  Point of error eleven is overruled.

Appellant's twelfth point of error concerns prospective juror Catherine Roberts.  The record shows that, at the beginning of voir dire, Roberts indicated that she generally favored the death penalty.  When the prosecutor explained the punishment phase to her, she said that she would keep an open mind at punishment and make the State prove future dangerousness.  She also affirmed that she could keep an open mind concerning mitigation.

Roberts's answers to defense counsel's questions were generally consistent with her answers to the prosecutor's questions.  When defense counsel asked Roberts whether she thought that poverty or education would be sufficiently mitigating, she responded that they would not.  When counsel asked her whether mental illness, child abuse, and spousal abuse would be sufficiently mitigating, Roberts answered that they could be, "depending on all the evidence."  Defense counsel then challenged Roberts on the grounds that she would not be able to "presume a life sentence" and that she was mitigation-impaired because she would not consider poverty and education as mitigating factors.

The record does not support appellant's assertion that Roberts would be unable to presume that a life sentence would be appropriate after she found appellant guilty but before she heard the evidence at the penalty phase.  When the law was explained to her, Roberts affirmed that she would make the State prove future dangerousness.  Roberts's views as to

---

[27] *See Heiselbetz v. State,* 906 S.W.2d 500, 509 (Tex. Crim. App. 1995).

whether particular types of evidence would be sufficiently mitigating did not render her challengeable for cause. Point of error twelve is overruled.

Appellant's thirteenth point of error concerns prospective juror Billy Esparza. At the beginning of voir dire, Esparza indicated that he generally favored the death penalty. When the prosecutor explained the punishment phase and the special issues to him, he indicated that he would presume that a sentence of life without parole would be appropriate until the State proved the defendant's future dangerousness. Initially, Esparza did not see a difference between the terms "possibility" and "probability," but he indicated that he understood the difference after the prosecutor explained it to him. Esparza affirmed that he would keep an open mind and listen to all the evidence before he decided the mitigation issue. He stated that he did not think that substance abuse, poverty, or education would be mitigating, but he said that he would keep an open mind and listen to all the evidence before making a decision.

When defense counsel asked Esparza about the distinction between probability and possibility, Esparza hesitated to give a direct answer. However, Esparza eventually affirmed that the term "probability" signified something more than "possibility":

Q. Let me talk about one other thing. . . . The prosecutor talked to you about the definition of "probability." Do you remember that?

A. Yes.

Q. What was your definition of "probability?"

A. I think I said 50/50.

Q.      One of the things that concerned me, you said possibility and probability were the same thing.  You remember that?

A.      I don't think I said they were the same thing.

Q.      Tell me, you see the difference between probability and possibility?

A.      How could they be the same?

Q.      No, the difference.

A.      The difference?  I don't know.

Q.      You understand the law says that it's a probability?

A.      Yeah.

Q.      There are no definitions for these words. . . . I submit there's a definite distinction between probability and possibility[.]

A.      Yes, okay.

Q.      Do you see any distinction after the prosecutor went over it with you and talked about more than a mere possibility as far as definition of "probability"?  Do you understand that?

A.      Yes.

Q.      Do you have any questions for me, Mr. Esparza?

A.      No, sir.

At the conclusion of voir dire, defense counsel challenged Esparza on the grounds that he was mitigation-impaired in that he was unable to consider poverty or education as a mitigating factor.  Counsel also challenged Esparza on the ground that he had "a problem [with] the definitions of 'possible' and 'probable.'"

Esparza's views that poverty and education were not mitigating did not render him challengeable for cause. Although he expressed some initial confusion concerning the distinction between "probability" and "possibility," he understood and accepted the distinction once it had been explained to him. Therefore, the trial court did not abuse its discretion in denying the challenge for cause.[28] Point of error thirteen is overruled.

Appellant's fourteenth point of error concerns prospective juror Michael Davis. During the State's examination, Davis said that he could keep an open mind and consider all the evidence in answering the future dangerousness and mitigation questions. During the defense's examination, counsel asked Davis what the result would be if he found the defendant guilty and answered the future dangerousness question affirmatively. Davis replied, "[P]robably the death penalty." Counsel asked Davis if his mind would be made up at that point, and he agreed that it would be. However, Davis then said that the death penalty should be invoked at that point "unless there's just mitigating circumstances to sway me the other way." Counsel asked Davis, if he found defendant guilty and a future danger, "[N]ow can you go forward and look at that [mitigating evidence] and unring the bell?" Davis answered, "Yes." But then, when counsel asked, "There isn't anything you would ever consider to be mitigating to unring that bell, so to speak?" Davis responded, "Uh, yeah."

---

[28] *See Murphy v. State,* 112 S.W.3d 592, 600 (Tex. Crim. App. 2003) (juror who understood the distinction between "probability" and "possibility" after it had been explained to him was not challengeable for cause).

The court questioned Davis in order to clarify his responses. During this questioning, Davis indicated that after he found a defendant guilty and answered the future dangerousness question affirmatively, the result would be a death sentence if he did not find sufficiently mitigating evidence, but a life sentence if he found sufficient mitigation. At the conclusion of voir dire, counsel challenged Davis on the grounds that he was "mitigation-impaired," and that once he found the defendant guilty and answered the future dangerousness question affirmatively, he would not consider mitigating factors. Counsel also asserted that after finding the defendant guilty, Davis would always find the defendant to be a future danger.

The record shows that Davis gave inconsistent answers with regard to whether he would consider mitigating evidence, but he affirmed on several occasions that he would follow the law and consider mitigating evidence. Appellant's assertion that Davis would always find the defendant to be a future danger is not supported by the record. We afford particular deference to the trial court's determination that Davis was not challengeable for cause.[29] Point of error fourteen is overruled.

Appellant's fifteenth point of error concerns prospective juror John Reeves. In addition to setting out the grounds for defense counsel's challenge to Reeves, appellant "submits that the use of the phrase 'trips up juror[s]' by the State influenced this juror's answers in that it made him aware of how he needed to answer the question of future dangerousness to be qualified as a juror rather than expressing his true feelings concerning

---

[29] *See King,* 29 S.W.3d at 568.

the death penalty." We understand appellant to mean that the prosecutor's use of this phrase impeded the defense's ability to develop a challenge for cause by discouraging Reeves from answering defense counsel's questions candidly.

During voir dire, the prosecutor discussed the law applicable to the guilt phase, and then explained that, if the jurors found the defendant guilty, they would be given two questions at the punishment phase. The prosecutor explained that, after finding the defendant guilty and before hearing any evidence at the punishment phase, the jury would have to presume that life in prison would be the appropriate punishment. Reeves stated that he would keep an open mind in answering the future dangerousness question and not automatically assume that the defendant would be a future danger. The prosecutor then continued:

Q.       I'm gonna go back here. Never fails, once I have no further questions for you and [defense counsel] gets to ask you questions, he always trips up jurors on this.
         At the point you have found someone guilty. Think where we are on this. The point you have actually found him guilty. And you found him guilty of a horrendous, horrible murder, multiple people, with no justification, not an accident, not self-defense; [he's] not defending a third person; he's not insane.
         What are your thoughts on the death penalty at that point?

A.       I certainly would be leaning in that direction.

Q.       Okay. Now, I think that's normal. That's where he trips 'em up.

Defense:  Your honor, I object to comments on counsel as far as --

Court:    They just have different points of view when they ask you questions, Mr.–

A.   Why should I get tripped up?  Why should I be any different?

Q.   Your opinions are fine.

    At this point, as a juror, though, you haven't heard punishment evidence yet.  So you, as a juror, cannot be leaning towards the death penalty.  In fact, just the opposite; you have to be leaning towards life until the state proves to you it should be death.

    You see what I mean?

A.   Yes.  I assume you're saying you almost–if you can, you're almost wiping the slate almost clean to proceed to the next basic trial part.

Q.   Until you can hear everything.  Then you can consider the fact that you found him guilty.  You can't automatically lean towards death.  The law wants you to listen to everything.  May be something in his background.

A.   I took your question to mean: If that's all there was at that point, what would your feelings be?

Q.   I can tell you that if the state weren't seeking the death penalty and you found someone guilty of the same crime it's an automatic life sentence.  Maybe it's easier to think in terms of that.

A.   That's probably a better way.

Q.   At the point you found him guilty, that's a life sentence, okay?  That's a life sentence.

    Now, if the state puts on evidence . . . that convinces you beyond a reasonable doubt that he's probably gonna continue being a danger, even in prison, at that point you get to change that to a death sentence.

    Does that –

A.   Makes more sense, yes.

Q.   If I come back and ask you again: At the point you just found him guilty, as a juror, what are you thinking?

A.   As a juror.  Right now I'm at life sentence.

Q.     So you–you know, it is a mental exercise.  What it really comes down to, is it a mental exercise that you feel you can give more than lip service, that you could actually do as a juror?  Or would you have feelings you really would be leaning towards a death sentence, honestly, and it may not be something you could actually give more than lip service to?

A.     I think I could do the right way, as you explained.  I think not knowing anything about the procedure before coming here, not knowing what the circumstances were with regards to the death penalty and that type thing–regardless what my answers were, I didn't know.  And I said, just a layman, we would think a horrendous crime, you would lean.  Now you explained there's two procedures and the proper way to do it.  But just coming in here, I would [lean toward the death penalty].

Q.     Obviously, it would be unfair to get into the facts at this point, try to commit you one way or the other.  I can, however, assure you it's capital murder.  It's gonna be a horrific crime, no matter which way you look at it, by the nature of the crime. . . . The law says you still go with that automatic assumption it's a life sentence unless you hear something in either phase of the trial that convinces you he's gonna be a continuing danger.
             So you're telling me, "If the law requires that of me, I can d[o] it"?

A.     Yes.

Q.     Or, "I think I can do it"?

A.     I can do it, yes.

The prosecutor then discussed the mitigation issue, and Reeves said that he would give it fair consideration if the jury reached that question after finding the defendant guilty and finding that the defendant would be a future danger.

Defense counsel remarked on the prosecutor's use of the words, "trips 'em up" during his examination of Reeves:

Q.      You know, it's funny.  [The prosecutor] used the words "tripped you up."

I want to use words they use: "follow the law," "be fair and impartial." Those are all words that I think sometimes, even the judge points out, it makes someone answer in a way they think they're supposed to answer.

If I came up and said, "Mr. Reeves, this is the law.  You can follow the law, can't you," that implies that the answer is yes and it's harder to say no in that situation.  That's what the judge was talking about when he talked to you.

All we want is honest answers here.  There are laws that people disagree with.  And if that's the situation, we need to know.

*  *  *

Q.      You understand that if you find someone guilty, you go forward to the punishment stage.  The first special issue, the future issue–the future-dangerousness issue, if it's determined beyond a reasonable doubt the individual will probably be a continuing threat to society, then you answer yes. Then if that answer is yes, you proceed to Special Issue Number 2.

If the answer's no, you know what happens?  He's not a future danger.

A.      It's automatic life in prison.

Q.      Exactly.  I'm not trying to trip you up.

A.      I always slow up on your answers.  I have been warned.

Q.      And we're gonna get back to the question that she said that I was trying to trip people up on here in a minute.

You look at the mitigating circumstance or circumstances that would warrant a life sentence without possibility of parole.  If the answer's yes, there's mitigating circumstances, then what happens?

A.      Life sentence.

Q.      Right, exactly.  I'm not trying to–

A.      I'm processing your question.

Q.      If the answer's no, there aren't any mitigating circumstances?

A.      It's the death penalty.

Q.   Sure. All right. So what I want to look at is put you in a hypothetical. You answered this originally one way with the prosecutor. She had used the words "tripped up." It's not. It's the natural tendency of people. If that's the way someone leans, one way or another, that's what we need to know.

A.   Sure.

Q.   The hypothetical gets to this.
     If you're on a jury, hypothetically, you and 11 other individuals find someone guilty of capital murder. As the prosecutor explained to you, it's gonna be a heinous crime. It's a capital murder. You can imagine it's horrific. Person intended to commit the crime, meant to kill two people. Wasn't self-defense[;] wasn't defense of another person; individual wasn't insane.
     As the prosecutor said, at that point what are your thoughts on the death penalty?

A.   We have already decided?

Q.   You have determined he's guilty of capital murder. See I used it four times, but it's tripped up–but people are–if you found someone guilty, people typically say, "You know what? The death penalty."

A.   I think not knowing what I know now, you assume that's what you would think in a death-penalty case. Been explained a little differently to me. The real question is can I change my thinking, in the second phase. I feel I can. My answer is quite honest. Coming in here, that's my normal reaction. . . .

Q.   That's what I want to get to. When the rubber hits the road, can you do it?
     A lot of people said, "I might be able to." I give the example like getting on a plane flying to Austin and the pilot says, "I think I can get us there. I might be able to." You don't get a warm, fuzzy feeling at that point and might be heading for the exit door.
     That's where it's difficult; can someone really do that? The prosecutor used the words of a "mental exercise." It's more than that. It's really looking introspectively at yourself: "Can I do this? Setting aside my initial reaction, which is leaning towards the death penalty or something, that you know what? I'm probably gonna get in there and will probably lean towards that side. I know the law tells me to do one thing. I'm supposed to presume life. I don't know if I can."

> Push comes to shove, that's what I'm trying to find out. It extends to the next question. Tell me your thoughts.

A.    I think I'm on board with the special issue question so I think that helps me in separating myself from the guilty to the punishment phase. The second board up there with the special issue, that helps me say yes, I'm able to do it.

Q.    You used a couple [of] terms that perk my ears up: "I think I can," "I can probably."

A.    Well, it's a tough one. This is all new to me of–I'm not there. You are.

Q.    I understand. That's the dilemma people get in with the answers. Unfortunately, the law requires yes-or-no answers. I'm not saying–I told you the law. Someone's supposed to, but the question is, can you do that? If you can, that's fine. If you can't, I need to know i[t]. Unfortunately, can't accept "I think" or "probably."

A.    I think I can. I know I can do it. I can do this.

Reeves continued to agree that he could follow the law concerning future dangerousness. He also stated that he would consider mitigating circumstances. When defense counsel questioned him about specific types of potentially mitigating evidence, Reeves indicated that he would consider poverty and education "to a small degree" as mitigating factors, and he would consider mental illness to a greater degree. Counsel then challenged Reeves for cause on the grounds that he would be leaning towards death and would always find future dangerousness after finding the defendant guilty.

The record reflects that, once the law was explained to him, Reeves agreed that he could set aside his personal feelings and follow the law, and he would not automatically lean toward the death penalty. In addition, the record does not support appellant's assertion that

Reeves would always find future dangerousness after finding the defendant guilty. Point of error fifteen is overruled.

Appellant's sixteenth point of error concerns prospective juror Ronald Jarvis. Counsel challenged Jarvis on the ground that he was "mitigation impaired" and would not consider poverty as a mitigating factor. The record shows that Jarvis indicated that he would place the burden on the defense to show sufficiently mitigating evidence, and he did not consider poverty to be a mitigating factor. Neither of these facts rendered him challengeable for cause.[30] Point of error sixteen is overruled.

Appellant's seventeenth point of error concerns prospective juror Susan Cassel. He contends that Cassel was challengeable for cause under Article 35.16(a)(5), which provides that a challenge for cause may be made by either the state or the defense for the reason that

> the juror has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render the juror unfit for jury service, or that the juror is legally blind and the court in its discretion is not satisfied that the juror is fit for jury service in that particular case[.]

A "mental defect" may be present when the prospective juror's responses show an inability to understand the jury's role in capital proceedings.[31]

During voir dire, Cassel said that she understood and would follow the law concerning the State's burden of proof at the guilt phase. She also stated that after finding a defendant guilty, she could presume that a life sentence was the proper punishment. She affirmed that

---

[30] *See Gardner,* 306 S.W.3d at 299-300; *Saldano,* 232 S.W.3d at 92, 96, 98.

[31] *Matamoros v. State,* 901 S.W.2d 470, 476 (Tex. Crim. App. 1995).

she could presume that the defendant would not be a future danger, unless and until the State proved future dangerousness during the punishment phase. Cassel also said that she would be open to considering mitigating circumstances.

Near the conclusion of voir dire, defense counsel asked Cassel if she had any questions for him. Cassel asked for clarification about the timing of the different parts of the trial. Counsel explained that the guilt phase would come first, and then, if the jury found the defendant guilty, the punishment phase would follow. During punishment, the jury would hear evidence concerning both future dangerousness and mitigation, all at the same time. The jury would then retire to deliberate on the future dangerousness question and then, if the jury found that the defendant was a future danger, the jury would deliberate on the mitigation question. Cassel thanked defense counsel for this information.

Counsel then challenged Cassel for cause, asserting,

Judge, at this time we spent over an hour and a half speaking to this juror. It's clear she does not have the mental capacity to fully understand the nature of the issues before her and we do not feel that–I mean, we have had to go back and cover these things in depth on every point that applies and she's been very–wavered back and forth as far as whether or not she has an understanding what's being asked as well as an appreciation of the issues involved. We feel that her inability to understand the issues, to understand–

I'm talking to her about the special issues in punishment and she's going back asking how the trial works. That's not the kind of juror that the law envision[s] sitting on this type of case. . . .

We would challenge the juror for cause for a lack of appreciation and understanding of the process and we would ask the court to excuse this juror for cause.

The trial court responded, "I'm not sure, Mr. Johnson, whether you and I just observed the same juror [for] an hour and a half. Be that as it may, your motion that she be stricken for cause is denied." Counsel then requested an additional peremptory strike, which was denied, and he identified Cassel as an objectionable juror. Cassel was seated as the twelfth juror.

This record does not demonstrate that Cassel had any bodily or mental defect that rendered her unfit for jury service. The record shows only that, when defense counsel asked Cassel if she had any questions, she asked him for clarification about the timing of the different parts of the trial. Counsel answered her question, and she thanked him. The trial court did not abuse its discretion in denying appellant's challenge for cause. Point of error seventeen is overruled.

Because appellant must show that the trial court erred by denying his challenges for cause to three prospective jurors, we need not consider his third and fourth points of error,[32] and they are overruled.

In points of error eighteen and nineteen, appellant asserts that, as a result of the errors alleged in points one through seventeen, the jury as constituted was biased or prejudiced, thus depriving appellant of a fair trial in violation of the United States Constitution and the Texas Constitution.[33]

---

[32] Those points of error deal with appellant's challenge for cause to prospective jurors Kristine Marie Bell and Kimberlyn Moriarity.

[33] Appellant does not make any separate argument in support of his claim of state constitutional error, and so we resolve this claim under the federal constitution only. *See*

(continued...)

We have found no error with respect to appellant's individual jury selection points of error, and so these points, complaining of cumulative error, are also without merit. Points of error eighteen and nineteen are overruled.

**B.     Motion for Separate Juries**

In his twentieth point of error, appellant argues that the trial court erred by denying his pretrial motion to impanel separate juries for the guilt phase and the penalty phase. Appellant urges that the effect of the death-qualification process on appellant's jury violated his right to a fair trial "as embodied in the concepts of equal protection [and] due process under both the Texas and United States Constitution[s]."[34] He cites to social-science studies reporting that death-qualified jurors are more conviction-prone and more likely to believe that the law favors the death penalty as an appropriate punishment than jurors who have not gone through the death-qualification process.

The United States Supreme Court has rejected similar claims that relied, in part, on the same social studies cited by appellant.[35] After identifying "some of the more serious problems" with those studies, the Supreme Court held that, even if those studies established that the death-qualification process does in fact produce juries that are somewhat more conviction-prone, "the Constitution does not prohibit the States from 'death qualifying' juries

---

[33](...continued)
*Heitman v. State,* 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991).

[34] *Id.*

[35] *See Lockhart v. McCree,* 476 U.S. 162, 170 nn.4, 6 (1986).

in capital cases."[36]  This Court has also rejected the argument that the death-qualification process unconstitutionally influences jurors to favor the death penalty.[37]  Furthermore, there is no constitutional impediment to a determination of sentence by the same jury that determined guilt.[38]  Point of error twenty is overruled.

## C.  Special Issues Not Charged in Indictment

In his twenty-first point of error, appellant claims that the trial court erred by denying his pretrial motion to preclude the death penalty as a sentencing option because the indictment did not include notice of the penalty-phase special issues, and these issues are elements of the offense that must be pleaded in the indictment.  He acknowledges that we have rejected similar claims.[39]  We are not persuaded to reconsider our prior decisions.  Point of error twenty-one is overruled.

## D.  Spectator Outburst at the Punishment Phase

Appellant asserts in his twenty-second point of error that the trial court committed error by not declaring a mistrial after a spectator caused a disturbance in the presence of the jury.  He argues that the disturbance was an external influence on the jurors, and that the trial court's refusal to grant a mistrial violated his constitutional right to be tried by impartial

---

[36] *Id.* at 173.

[37] *See Ramos v. State,* 934 S.W.2d 358, 369 (Tex. Crim. App. 1996).

[38] *See Hathorn v. State,* 848 S.W.2d 101, 110 (Tex. Crim. App. 1992).

[39] *See, e.g., Joubert,* 235 S.W.3d at 732.

jurors whose verdict is based solely on the evidence at trial. He further asserts that the spectator's conduct was "designed to deny appellant a fair trial."

A trial court's denial of a request for a mistrial is reviewed under an abuse of discretion standard.[40] An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling.[41] The ruling must be upheld if it was within the zone of reasonable disagreement.[42] A mistrial is an extreme remedy that should be granted "only when residual prejudice remains" after less drastic alternatives have been explored.[43] When the party requesting a mistrial does not first request a lesser remedy, we will not reverse the court's judgment if the problem could have been cured by a less drastic alternative.[44]

Spectator conduct that impedes normal trial proceedings will not result in reversible error unless the defendant shows a reasonable probability that the conduct interfered with the jury's verdict.[45] Injury to a defendant is measured on a case-by-case basis.[46]

---

[40] *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

[41] *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

[42] *Id.*

[43] *Id*. at 884-85.

[44] *Id.* at 885.

[45] *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996) (reh'g granted, reversed on other grounds).

[46] *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985).

In this case, the record shows that, during the prosecutor's closing argument at the punishment phase, the proceedings were interrupted when a man rushed toward a break in the rail that separated the spectators from the "attorney-accessible-only area" of the courtroom. The prosecutor had been arguing that mercy was not appropriate in this case:

We know Robert Sparks' background, how he grew up.

* * *

You know, Robert Sparks' mom came and testified yesterday and she testified that Robert was two or three years old and would wake up in the middle of the night. She did what a parent's supposed to do. She . . . gave him water or gave him milk and gave him love, because that's what an adult's supposed to do with a young child when they're scared in the night or wake up in the night.

What did little Troy[47] get from this man when the tears start[ed] coming out of his eyes as Robert stuck that knife into him over and over again? You know what little Troy got? He didn't get milk, he didn't get water. He got another plunge of that blade.

I don't care how paranoid you are –

At this point, the record shows an audience interruption.

Bailiff:      Whoa up, brother. Stop there.

Bailiff:      Get back.

Bailiff:      Stay there. Get him.

Defense:   Ask for a recess, your honor.

Court:       We'll take a break for a minute. Neal, if you would get the jury a second.

---

[47] Witnesses and counsel sometimes referred to Harold as "Troy" or "Junior Mac."

After the jury had been removed, the trial court explained the interruption.

Court:  Let the record reflect we're outside the presence of the jury.

    So the record's clear, during [the prosecutor's] arguments somebody in the audience jumped up to move towards the break in the rail that brings you into the attorney-accessible-only area of the courtroom.

    The bailiffs quickly and aptly took care of the situation.  Took a short break.

    * * *

Defense:  Your Honor, at this time the defense is gonna move for a mistrial.

    Like to at this time make a bystander's bill and would call a witness to testify in regards to the actions.  This is the second time this individual has disrupted the court proceedings during portions of the descriptions of the evidence.

    And if the court will allow, I'll make an offer of proof it's my understanding this is the same individual that during testimony in the guilt/ innocence phase of the trial, jumped up, started yelling and had to be escorted out of the courtroom by the prosecution.

    We objected at that time.  The court–

Prosecutor: This case?

Defense:  Yes.  In fact, the court told members of the jury [sic; audience] if there was any more outbursts in regards to testimony, they would be barred from the courtroom.

After an off-the-record discussion at the bench, appellant's counsel continued:

Defense:  Judge, there's been discussion at sidebar in regards to the exact timing of when this–the exact events occurred.  There was an outburst in the testimony of the guilt/innocence phase, and due to that outburst, my recollection, the court was going to excuse the jury to admonish the jury–or admonish the audience any further outbursts would result in any individuals being barred from further admittance into the courtroom, which time the jury was standing up at–the

prosecutor Heath Harris was required to get up and take Harold Sublet, Sr., and escort him out of the courtroom because he again approached the rail.

It's my recollection, Judge, and I believe it to be accurate, and would call Heath Harris to testify.

Prosecutor:   After arguments you can make your bill.

Court:   What's your motion?

Defense:   Just let the record to reflect that now, in the conclusion or portion of [the prosecutor's] argument in regards to the infliction of wounds on Harold Sublet, Sr.–Jr., this same individual's now rushed the jury rail in front of the jury.

We believe this type of thing has prejudiced the defendant in the eyes of the jury. This individual again has been escorted out of the courtroom by the prosecutor Heath Harris, as well as several members of the bailiff[']s staff. We believe that. . . in the jury's eyes we have been prejudiced and ask the court to grant a mistrial at this time.

Court:   All right. [A]ny response?

Prosecutor:   Ask the court to deny the motion. The jury doesn't know who this fella is, who he's related to. They can draw their own conclusion and has got nothing to do with their deliberations.

Court:   I'm gonna deny your motion for mistrial. So the record's clear, I'll give each side a chance to supplement the record later with their recollection of prior occurrences.[48] Mine's a little different than [defense counsel's].

---

[48] The record does not reflect that either party supplemented the record with regard to any prior outbursts. Our independent review of the record reveals that during a portion of the prosecutor's opening argument that described Harold's murder, there was crying in the audience and a pause in the proceedings. The prosecutor stated, "I'm sorry. But [appellant] wasn't through yet," and went on to describe the murder of Raekwon. Later, during the State's examination of Chare's sister, Nicole, at the punishment phase, someone in the audience called out, "Bring it on." The examination then continued. We are unable to locate any objection or motion responsive to either of these prior outbursts. We decline to infer preservation or harm from this sparse record. *Cf. Howard,* 941 S.W.2d at 117 (declining to assume that conduct

(continued...)

The court admonished the members of the audience that any further outbursts would result in the person who caused the outburst being jailed and held in contempt. The jury was then escorted back into the courtroom, and the prosecutor continued his closing argument without further interruption.

In the past, we have found that an emotional outburst from members of the victim's family was not harmful when the outburst was non-verbal and the jury was immediately removed from the courtroom.[49] In *Landry,* the decedent's family members testified during the trial with such emotion that the court recessed at several points in order to allow them to regain their composure before continuing.[50] Later, during the defendant's closing argument, the decedent's widow and brother caused a commotion in the audience, and the judge retired the jury.[51] Defense counsel moved for a mistrial, noting for the record that he had been interrupted by an emotional outburst from the decedent's widow, who "was in the process of fainting and leaving the courtroom," and also by an outcry from the decedent's brother that was loud enough to be heard near the jury rail.[52] Finding it significant that these outbursts did not involve any verbal outcries and that the jury was immediately removed from the

---

[48](...continued)
occurred when the record did not reflect it).

[49] *See Landry,* 706 S.W.2d at 111-12.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 112.

courtroom, we held that appellant had failed to demonstrate how these emotional responses reasonably could have interfered with the jury's verdict.[53]

More recently, we held that a spectator's verbal, emotional outburst did not require a mistrial. In *Gamboa,* during a State's witness's testimony, a family member of the murder victim shouted, "You did this for 200 dollars?"[54] We determined that the trial court's statement to the jury that the outburst was made by someone who was not a witness and not under oath, coupled with the court's instruction to disregard what was said, was sufficient to cure the impropriety.[55] We held that nothing in the record suggested that the outburst was of such a nature that the jury could not ignore it and fairly examine the evidence in arriving at a verdict.[56]

Here, Harold Sublet, Sr., never testified. As the prosecutor pointed out, the jurors did not know who he was, but could "draw their own conclusions." Further, the conduct at issue was Sublet's non-verbal, emotional response to the prosecutor's closing argument. Rushing toward the jury rail was, arguably, more disruptive than the conduct at issue in *Landry* and *Gamboa,* but Sublet was quickly escorted out of the courtroom, and the jury was immediately removed.

---

[53] *Id.*

[54] *Gamboa v. State,* 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

[55] *Id.*

[56] *Id.*

Although the harm, if any, could have been cured by an instruction to disregard, appellant did not request this "lesser remedy."[57] Further, appellant has not carried his burden of showing a reasonable probability that the outburst interfered with the jury's verdict or posed a reasonable probability of injury to himself. Appellant offers only conclusory assertions that this disturbance violated his constitutional right to an impartial jury and was "designed" to deny him a fair trial. Point of error twenty-two is overruled.

**E.    Jury Instructions at the Guilt Stage**

In point of error twenty-three, appellant claims that the trial court erred in denying his requested jury instruction at the guilt phase on temporary insanity caused by involuntary intoxication. He argues that evidence of his belief that Chare had been giving him "yard treatment poison" was evidence of involuntary intoxication. He also points to Shunta's testimony that, when appellant showed up in front of her house shortly after the offense, he was behaving strangely and she thought he was on drugs.

Under Section 8.01 of the Penal Code, it is an affirmative defense to prosecution that, at the time of the conduct charged, the defendant, as a result of severe mental disease or defect, did not know that his conduct was wrong.[58] We have held that Section 8.01(a) implicitly encompasses the defense of temporary insanity due to involuntary intoxication.[59]

---

[57] *See Ocon*, 284 S.W.3d at 885.

[58] Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 8.01(a).

[59] *Mendenhall v. State,* 77 S.W.3d 815, 817-18 (Tex. Crim. App. 2002).

Accordingly, in deciding whether the evidence raises the defense of involuntary intoxication, we examine whether (1) the defendant exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of a "severe mental disease or defect" caused by the involuntary intoxication, the accused did not know that his conduct was wrong.[60]

Here, the requested jury instruction did not correctly recite the applicable law. Instead, the requested instruction recited the law as it existed prior to legislative amendments in 1983:

> You are instructed that involuntary intoxication is a defense to prosecution for an offense when it is shown that the accused has exercised no independent judgment or volition in taking the intoxicant and that as a result of his intoxication the accused did not know that his conduct was wrong, or [was in]capable of conforming his conduct to the requirements of the law allegedly violated.

When appellant committed this offense, it was no longer an affirmative defense to prosecution that the defendant, as a result of involuntary intoxication, was incapable of conforming his conduct to the requirements of the law.[61] Therefore, appellant was not entitled to the specific instruction that he requested.[62]

In addition, the record shows that, during the charge conference at the guilt phase, defense counsel explained that he was requesting the instruction on temporary insanity due

---

[60] *Id.*

[61] *See Mendenhall,* 77 S.W.3d at 817-18.

[62] In his brief, appellant relies upon *Torres v. State*, 585 S.W.2d 746 (Tex. Crim. App. 1979), which was decided under the pre-1983 insanity law.

to involuntary intoxication because appellant wanted it. Counsel did not distinctly specify the ground or basis for this requested instruction as required by Article 36.14. Further, we are unable to find any evidence in the record that would support a finding that appellant did not know that his conduct of stabbing his wife and two stepsons to death was "wrong."[63] In his brief on appeal, appellant points to evidence that he believed his family was poisoning him, but he fails to cite any record evidence that would support a rational jury finding that he did not know that his murderous conduct was "wrong." Nor did he cite any such evidence to the trial judge when he requested this jury instruction. Having failed to point out the factual basis for his requested instruction to the trial judge, appellant failed to preserve this issue for appeal.[64] Point of error twenty-three is overruled.

In point of error twenty-four, appellant claims that the trial court erred in denying his requested jury charge at the guilt phase on self-defense. He argues that his belief that he was being poisoned entitled him to this instruction, and that denying the instruction denied him the right to present his defenses to the jury and therefore denied him his right to a fair trial.

---

[63] As the State points out, there is considerable evidence that appellant knew that his conduct was wrong: he repeatedly apologized to Lakenya and Garysha for killing their mother and brothers and for raping them; he called 911 from Shunta's house and confessed to the dispatch operator; he told Shunta that, if there was a reward for catching him, his daughter Brianna should get it; he tried to avoid capture by attempting to change the license plate on his car; when he did not succeed in changing the plate, he drove to his mother's house and borrowed her car; he fled to Austin, but then returned and called a detective to ask about the death penalty and turning himself in.

[64] *See Mays v. State,* AP-75,924, __ S.W.3d __, 2010 Tex. Crim. App. LEXIS 480, at *37-40 & n.53 (Tex. Crim. App. 2010) (holding that a defendant's failure to specify the facts or legal theory supporting the submission of a defense forfeits the error on appeal).

A person is justified in using deadly force against another when and to the extent that he reasonably believes the force is immediately necessary to protect himself against another's use or attempted use of unlawful deadly force.[65] A defendant is justified in defending against danger as he reasonably apprehends it.[66] If the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction.[67]

Appellant was not entitled to a self-defense instruction under the facts of this case. Appellant was charged with the murders of Harold and Raekwon, but he does not assert that he reasonably believed that deadly force against his nine- and ten-year-old stepsons was immediately necessary to protect himself. At trial, there was no evidence that appellant reasonably apprehended any deadly force from his stepsons. Appellant confessed that the boys were asleep in their bedroom when he decided to kill them, and that he went into their room and woke them up, one by one, to kill them. Under these circumstances, the trial court did not err in refusing appellant's requested instructions.

In addition, the record shows that, during the charge conference at the guilt phase, defense counsel requested a jury instruction on self-defense. Counsel explained that he was requesting the instruction because appellant wanted it. Counsel did not specify the facts or

[65] Tex. Penal Code §§ 9.31(a), 9.32(a).

[66] *Hamel v. State,* 916 S.W.2d 491, 494 (Tex. Crim. App. 1996).

[67] *Ferrel v. State,* 55 S.W.3d 586, 591 (Tex. Crim. App. 2001).

legal theory that supported the submission of this defense. Therefore, the error was forfeited on appeal.[68] Point of error twenty-four is overruled.

## F.    Expert Witness at the Punishment Phase

In his twenty-fifth point of error, appellant asserts, "The trial court erred in overruling appellant's objection to the proffered expert testimony of witness A.P. Merillat." Appellant argues that Merillat testified about subjects–the prison classification system and opportunities for violence in the penitentiary–that were beyond his expertise.[69]

Texas Rule of Evidence 702 permits a witness qualified by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding or determining a fact issue. The party presenting the witness as an expert has the burden of proving that the expert is qualified.[70] A witness's qualification to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things.[71]

When addressing fields of study that are based primarily upon experience and training as opposed to the scientific method, the appropriate questions are: (1) whether the field of

---

[68] *See* Art. 36.14; *Mays*, 2010 Tex. Crim. App. LEXIS 480, at *37-40 & n.53.

[69] Appellant also complains that Merillat's testimony was prejudicial and inflammatory and denied him a fair trial. However, defense counsel did not object to Merillat's testimony on this basis at trial. Therefore, he failed to preserve this issue for appeal. TEX. R. APP. P. 33.1(a).

[70] *Wyatt v. State,* 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

[71] *Id.*

expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of that field; and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field.[72] The fact that the general subject matter is within the comprehension of the average jury does not require the exclusion of expert testimony.[73] The question of whether a witness offered as an expert possesses the required qualifications is a question resting largely in the trial court's discretion.[74] Absent a clear abuse of discretion, the trial court's decision to admit or exclude testimony will not be disturbed.[75] The appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement.[76] Appellate courts may consider several criteria in assessing whether a trial court has clearly abused its discretion in ruling on an expert's qualifications, including the complexity of the field of expertise, the conclusiveness of the expert's opinion, and the centrality of the area of expertise to the case.[77]

At the Rule 705 hearing, A.P. Merillat testified that he was a criminal investigator for the Special Prosecutions Unit, which investigates and prosecutes offenses within the prison

---

[72] *Nenno v. State,* 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas,* 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

[73] *Rodgers v. State,* 205 S.W.3d 525, 527 (Tex. Crim. App. 2006).

[74] *Nenno,* 970 S.W.2d at 561.

[75] *Id.*

[76] *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

[77] *Rodgers,* 205 S.W.3d at 528.

system. Merillat testified that he had been investigating such crimes for almost twenty years and that he had testified in court many times concerning (1) the prison classification system that would apply to convicted capital murderers who received life sentences; and (2) the opportunities for convicted capital murderers to be violent in prison. Merillat acknowledged that his knowledge of these subjects was mostly anecdotal, derived from his own investigations of prison crimes. He testified that the Special Prosecutions Unit is not part of the Texas Department of Criminal Justice ("TDCJ"), but that he spent a year working with internal affairs at TDCJ on use-of-force cases. Merillat testified that he would not be giving an expert opinion particular to appellant's case but instead would testify generally about opportunities to be violent in the prison system. Defense counsel questioned the need for expert testimony on this subject, asserting that it was "just common sense" that there were opportunities for violence in prison. Merillat responded that he had learned things through his job that the general public, as well as most prison officials and politicians, did not know.

Defense counsel repeatedly expressed concern that Merillat would testify about specific bad acts by individual prisoners in order to scare the jury. Counsel argued that he would have no way to verify the facts of these offenses if Merillat testified about them. Counsel also argued that Merillat was not qualified to testify about general classification and prison operations. The trial court indicated that Merillat would not be allowed to testify about particular incidents, but he would be allowed to answer general questions and testify about numbers or statistics. Counsel then questioned Merillat about his qualifications to

testify concerning numbers and statistics. Merillat responded by referring to a list containing the names of convicted capital murderers and the offenses they had committed while they were in prison. He stated that he expected to use that list as proof of his knowledge of the opportunities for violence in prison. The only statistics he proposed to discuss were contained in a report prepared by TDCJ. Merillat acknowledged that anyone could testify about what the report said, as it was widely available and no special expertise was required to interpret it.

Toward the end of the hearing, counsel argued, "He's not an expert in the field. All he's here to do is scare them about some anecdotal information he has about particular cases he investigated in the past. That's just a job, not expertise." The trial court disagreed, stating again that Merillat would be able to answer general questions, but also noting that the court would be receptive to counsel's objections to testimony concerning specific incidents. The court did not grant counsel's written motion in limine concerning specific bad acts because the court had not had an opportunity to read through it. The record does not reflect that counsel re-urged his motion in limine before Merillat testified in the presence of the jury.

In the jury's presence, the prosecutor began to question Merillat about the prison classification system, and defense counsel asked for an opportunity to conduct additional voir dire. Counsel then questioned Merillat about his expertise on prison classification. Merillat testified that he had received the same classification training as TDCJ classification employees. Counsel objected again to Merillat's lack of formal training, pointing out that

he was never employed by TDCJ even though he spent a year working with TDCJ internal affairs. Counsel's objection was overruled.

Merillat then described the prison environment experienced by life-sentenced capital murderers classified as G-3 inmates: they could go to chow hall and the library with other inmates, and they could go to school, medical facilities, and visitation. They could not work outside the prison walls without direct armed supervision. Merillat acknowledged that TDCJ's classification board could impose additional restrictions based on its review of an inmate's criminal history and records of bad acts, and in very limited circumstances an inmate might start out in administrative segregation or with a classification that was more restrictive than G-3. Even with restrictions, however, a significant level of violence occurred within the prison system. Merillat testified that there were over 14,000 disciplinary convictions for assaults by inmates on other inmates, over 5,000 disciplinary reports of assaults by inmates on staff, and 156 murders in prison between 1984 and 2008. He also stated that inmates had escaped from prison. He described the restrictive environment of death row and testified that even on death row, it was possible to commit crimes. Merillat stated that an inmate could choose to be violent or choose to be peaceable, and he specified that he was not expressing any opinions about this particular case.

Merillat's testimony was generalized educator-expertise information designed to "assist" the jury under Rule 702. Therefore, the trial judge did not abuse his discretion in admitting it after determining that Merillat was qualified to testify as an expert regarding the

prison classification system and opportunities for violence in prison. Point of error twenty-five is overruled.

## G.     Victim-Impact Evidence

In his twenty-sixth and twenty-seventh points of error, appellant asserts that the trial court erred in overruling his objections to State's Exhibits 115 and 116–the "progress notes" written by LaKenya and Garysha's therapist–which were admitted at the punishment phase. Appellant argues, "The proffered evidence is not relevant as it amounts to extraneous victim impact evidence."

The record shows that when the prosecutor offered Exhibits 115 and 116 into evidence, defense counsel objected generally that the information in them was not admissible and not relevant to any issue before the jury. He did not specifically object that the exhibits were extraneous victim impact evidence. The trial court instructed counsel for both parties to approach the bench. Following an off-the-record discussion, the court overruled the objection and admitted the exhibits. The prosecutor then called Garysha and LaKenya to testify about the impact the offense had on them. Appellant did not object to their testimony.[78]

---

[78] To the extent that appellant may intend to complain about the girls' testimony at the punishment phase, this matter is not preserved for appellate review because he did not object. *See* TEX. R. APP. P. 33.1. Moreover, appellant waived any claim of error concerning portions of the exhibits that were read into the record during the girls' testimony. *See Roberts v. State,* 220 S.W.3d 521, 532 (Tex. Crim. App. 2007) (attack on victim impact testimony in general, advanced before any testimony was heard, did not place the trial court on notice that appellant would find particular testimony objectionable); *Ladd,* 3 S.W.3d at 572 (trial court was not

(continued...)

Appellant's specific complaint on appeal that Exhibits 115 and 116 were inadmissible extraneous victim impact evidence is not preserved by his general relevance objection at trial.[79]  As appellant failed to preserve error, points of error twenty-six and twenty-seven are overruled.

## H.    Sufficiency of Future Dangerousness Evidence

In his twenty-eighth point of error, appellant contends that the evidence of his future dangerousness was legally insufficient.  He asserts that he had no prior violent criminal background and that the defense experts testified that he was a low risk for future dangerousness.  Appellant further argues that none of the evidence presented at the punishment phase showed a probability that he would be a continuing threat to society if he were sentenced to life in prison.

When reviewing the future dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society.[80]  The circumstances of

---

[78](...continued)
required, in the face of a global objection, to sift through an exhibit and segregate the admissible portions from the inadmissible portions).

[79] *See* TEX. R. APP. P. 33.1.  We note that testimony concerning the impact of the murder of their two brothers upon LaKenya and Garysha is relevant.  *See, e.g., Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

[80] *Wardrip v. State,* 56 S.W.3d 588, 593 (Tex. Crim. App. 2001).

the offense "can be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue."[81]

Here, the record contains ample evidence of appellant's future dangerousness. The facts of the offense alone would have been sufficient. However, the State did not rely solely on the facts of the offense. At the punishment phase, the prosecutor introduced appellant's juvenile record, penitentiary packet, and disciplinary records. The jury learned that, as a juvenile, appellant had been "convicted" of criminal mischief, theft, unlawful carrying of weapons, and burglary.[82] As an adult, he had been convicted of aggravated robbery. While he was in prison for that offense, his disciplinary violations included failure to obey reasonable orders, masturbation in public, fighting, assaulting guards, and sodomy. An inmate who had been housed with appellant in prison testified that appellant beat him up and

---

[81] *Id.* (quoting *Wilson v. State,* 7 S.W.3d 136, 142 (Tex. Crim. App. 1999)); *see also Martinez v. State,* 924 S.W.2d 693, 696 (Tex. Crim. App. 1996) (finding that a rational jury could perceive that the use of a knife to repeatedly stab a fallen victim showed a wanton and callous disregard for human life, sufficient to merit an affirmative answer to the future dangerousness issue).

[82] Although appellant, as a juvenile, would have been "adjudicated delinquent" rather than "convicted" of these offenses, in the presence of the jury the prosecutor referred to appellant's "certified juvenile conviction record." In addition, appellant's mother testified that appellant had been "convicted" of these offenses as a juvenile. Appellant's juvenile record, State's Exhibit 99, reflects that appellant was adjudicated delinquent of possessing prohibited weapons, unlawful carrying of a weapon, and burglary. Additionally, his juvenile probation report, State's Exhibit 102, reflects that appellant paid restitution in a criminal mischief case and a theft case. Two breaking and entering charges and one aggravated-assault charge were dismissed. Appellant was still serving probation for the burglary and weapons offenses when he was arrested for aggravated robbery.

raped him on several occasions. Several officers testified about appellant's confrontational and violent behavior while he was in jail awaiting trial.

Two former girlfriends testified that appellant physically assaulted them without warning. Garysha and LaKenya, as well as Chare's sister Nicole, testified about appellant's controlling and abusive behavior towards Chare and her children. Nicole and LaKenya had urged Chare to leave appellant. Nicole testified that, a few days after appellant killed Chare and the boys and fled to Austin, she was warned by appellant's daughter to stay away from her house because he had returned to Dallas to kill her.

On this record, a rational jury could find, beyond a reasonable doubt, that there was a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. Thus, the evidence was legally sufficient to support the jury's answer to the future dangerousness special issue. Point of error twenty-eight is overruled.

## I.    Mitigation Special Issue

In appellant's twenty-ninth point of error, he asserts that due process requires this Court to review the sufficiency of mitigation evidence on appeal. Appellant acknowledges that this Court has held that a jury's negative answer to the mitigation special issue in capital cases will not be reviewed for sufficiency of the evidence, and we have rejected the claim that this deprives a defendant of "meaningful appellate review."[83] He further acknowledges that we have rejected the claim that, because meaningful appellate review of the jury's

---

[83] *Green v. State*, 934 S.W.2d 92, 106 (Tex. Crim. App. 1996).

mitigation determination is impossible, the mitigation special issue violates the Eighth Amendment.[84]    We have likewise rejected the claim that it violates the Fourteenth Amendment.[85]

Notwithstanding precedent, in his thirtieth point of error, appellant asserts that the jury's answer to the mitigation special issue was so against the great weight and preponderance of the evidence as to be unjust.  In support of this claim, he describes testimony from his mother and aunt "concerning [his] upbringing and mental illness," including his statements to them that Chare was poisoning him and that others were following him or trying to kill him.

The mitigation special issue "confers upon the jury the ability to dispense mercy, even after it has found a defendant eligible for the death penalty."[86]    There is no evidence that must be considered to have mitigating value.[87]  "Whether a particular piece of evidence is mitigating in the context of [the mitigation special] issue is a normative judgment that is not

---

[84] *Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).

[85] *Green,* 934 S.W.2d at 107.

[86] *Mosley,* 983 S.W.2d at 264.

[87] *See, e.g., McGinn v. State,* 961 S.W.2d 161, 169 (Tex. Crim. App. 1998).

amenable to appellate review."[88]  We decline to attempt such a review here.  Points of error

twenty-nine and thirty are overruled.

**J.      Constitutionality of Article 37.071**

In his thirty-first point of error, appellant asserts that the trial court erred in "not

concluding the punishment hearing and imposing a life sentence based on the trial court

being made aware of the issues supporting the reversal of the recent death-penalty case of

*Smith v. [Texas,]* 543 U.S. 37 (2004)."  Appellant argues that the current punishment scheme

in Texas violates "the doctrines pronounced" in several Supreme Court cases[89] because the

mitigation special issue is "nothing more than a nullification issue" to the future

dangerousness special issue.  Appellant asserts that the jury charges set forth in Article

37.071 compare unfavorably with guidelines promulgated by the American Bar Association.

The Supreme Court cases cited by appellant concern jury instructions that were given

prior to the 1991 amendment to Article 37.071.  That amendment set forth the mitigation

instruction that was given in appellant's case.[90]  Other than his conclusory statement that the

---

[88] *Id.; see also Eldridge v. State,* 940 S.W.2d 646, 652-53 (Tex. Crim. App. 1996), *disavowed on other grounds in Mosley,* 983 S.W.2d at 264 n.18 ("We cannot say that evidence is mitigating as a matter of law any more than we can say, in a non-capital case, that . . . the great weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated").

[89] Appellant lists *Penry v. Lynaugh (Penry I),* 492 U.S. 302, 319 (1989); *Penry v. Johnson (Penry II),* 532 U.S. 782, 797 (2001); *Tennard v. Dretke,* 542 U.S. 274 (2004); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Skipper v. South Carolina,* 476 U.S. 1 (1986); and *Smith v. Texas,* 543 U.S. 37 (2004).

[90] As amended in 1991, Article 37.071 provided:

(continued...)

current mitigation issue is "nothing more than a nullification issue," appellant makes no attempt to explain how the reasoning of cases involving jury instructions from before the 1991 amendment operates to invalidate the jury instructions given in his case.[91] In addition, appellant does not allege that the jury instructions in his case prevented the jury from giving meaningful consideration and effect to any mitigating evidence. Finally, appellant offers no supporting legal authority or argument for his assertion that the trial court had a *sua sponte* duty to take the punishment decision away from the jury. Thus, this claim is inadequately briefed.[92] Point of error thirty-one is overruled.

---

[90](...continued)
The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b) of this article, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Art. 37.071, § 2(e)(1) (1991). The current provision is the same, except that the instruction now specifies that the alternative sentence to death is a sentence of life imprisonment without parole. Art. 37.071, § 2(e)(1) (2009).

[91] Appellant did not object at trial to the jury instructions. Nor did he call the trial court's attention to *Smith v. Texas* or explain how he believed the holding in that case might affect his case.

[92] T EX. R. APP. P. 38.1.

In his thirty-second point of error, appellant asserts that the trial court erred by failing to provide a rational process for the jury to decide between a life sentence and the death penalty. Appellant's entire argument is that the mitigation issue

> is made vaguely conditional on the [special issue] on future dangerousness, burdening the consideration of mitigating circumstances that are not related to future dangerousness with a vague presumption in favor of death if the mitigating circumstances are somehow not "sufficient" in comparison to something not stated in the special issues.

Appellant fails to specify any action that the trial court was required, but failed, to take. Nor does he specify any statutory or constitutional violation. This claim is inadequately briefed, and we decline to address it.[93] Point of error thirty-two is overruled.

In his thirty-third, thirty-fourth, and thirty-fifth points of error, appellant asserts that the trial court erred in failing to instruct the jury that it should answer "yes" to the mitigation special issue so long as 10 jurors agreed that one or more mitigating circumstances exist, separately or in conjunction, sufficient to warrant a life sentence. He complains that the jury should have been instructed that the mitigation issue should be answered affirmatively so long as 10 jurors agreed, even if they disagreed as to which mitigating circumstance or circumstances were sufficient to warrant a life sentence.

Article 37.071, section 2(f)(3), requires the trial court to instruct jurors that they need not agree on what particular evidence supports an affirmative answer to the mitigation special issue. In this case, the trial court instructed the jurors in accordance with this

---

[93] *Id.*

requirement. To the extent that appellant urges that the instruction required by Article 37.071, and given in his case, is unconstitutional because it does not comply with *Mills v. Maryland,* 486 U.S. 367 (1988), we have rejected such claims in the past.[94] Points of error thirty-three, thirty-four, and thirty-five are overruled.

In points of error thirty-six and thirty-seven, appellant asserts that the trial court erred by not informing the jury that a failure to agree unanimously on the mitigation special issue would have "the same dignity and respect" as a "yes" or "no" answer and would have the same legal effect as a "no" answer. He argues that the failure to give this charge violated Article 36.14, which gives effect to the "due course of law" provision of the Texas Constitution and the "due process" provision of the United States Constitution by requiring that the jury charge distinctly set forth the law applicable to the case. He asserts that the last sentence of Article 37.071, section 2(a)(1),[95] seeks to suppress and conceal important information from the jurors because they are not informed that a life sentence, rather than a mistrial, will result from a failure to answer the special issues. Similarly, in his thirty-eighth

---

[94] *See, e.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *see also Young v. State,* 283 S.W.3d 854, 879 (Tex. Crim. App. 2009) (finding that the failure to give this instruction, although statutory error, was not constitutional error that deprived appellant of a unanimous verdict or a fair trial).

[95] Appellant's brief cites to Article 37.0711, § 3(3)(i), which is applicable to convictions for offenses committed before September 1, 1991. Because appellant's offense was committed in 2007, we presume that he means to cite to the last sentence of Article 37.071, § 2(a)(1), which is the analogous provision applicable to convictions for offenses committed on or after September 1, 1991. Both provisions state that neither the court nor the parties may inform a juror or prospective juror of the effect of the jury's failure to agree on the special issues.

and forty-third points of error, appellant asserts that the "12/10" rule in Texas capital jury charges is a misrepresentation of the law and constitutes cruel and unusual punishment as well as a violation of due process because jurors never learn that if the jury as a whole cannot agree on an answer to one of the special issues, a life sentence will result. This Court has repeatedly rejected similar claims.[96] We are not persuaded to revisit them here. Points of error thirty-six, thirty-seven, thirty-eight, and forty-three are overruled.

In appellant's thirty-ninth[97] point of error, he claims that the trial court erred in denying his motion to preclude the death penalty as a sentencing option. He argues that Article 37.071 is unconstitutional because it fails to provide a method for the State to determine the deathworthiness of the defendant. Appellant complains that the method of determining which cases shall be prosecuted as capital offenses, and in which capital cases the death penalty will be sought, varies from county to county. He asserts that the failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought violates the principles set forth in *Bush v. Gore*, 531 U.S. 98 (2000), as well as his rights to equal protection and due process as guaranteed by the Fourteenth Amendment to the United States Constitution, Article 1, Sections 13 and 19, of the Texas

---

[96] *See, e.g., Threadgill v. State*, 146 S.W.3d 654, 673 (Tex. Crim. App. 2004); *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003).

[97] In his brief, appellant prefaces his argument concerning points of error thirty-nine through forty-seven with an acknowledgment that we have previously rejected these points. He invites us to review "any prior stand on any issue" and states his intention to preserve these points of error for federal review.

Constitution, and Texas Code of Criminal Procedure Article 1.04.[98] This Court has repeatedly rejected similar claims, and we are not persuaded to reconsider them here.[99] Point of error thirty-nine is overruled.

In his fortieth point of error, appellant claims that Article 37.071 "is unconstitutional in violation of the cruel and unusual punishment prohibition because it allows the jury too much discretion to determine who should live and who should die and because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty." Appellant argues that, under the present Texas statute, the jury has unfettered discretion that invites and permits arbitrary application of the death penalty in violation of *Furman v. Georgia,* 408 U.S. 238 (1972). He complains that the mitigation instruction unconstitutionally allows the jury to impose a life sentence "if, in their sole discretion, they choose to do so." As such, he reasons, the Texas scheme does not insure a reasonably consistent application of the death penalty. Appellant also complains that the jury has unfettered discretion because the jury can decide what evidence, if any, is mitigating, and can choose to completely disregard mitigating evidence. This Court has repeatedly rejected claims that the mitigation special issue gives the jury unfettered discretion and

---

[98] Appellant offers no separate argument concerning any state constitutional violations, and so we resolve this claim under the federal constitution only. *See Heitman,* 815 S.W.2d at 690 n.23.

[99] *Neal v. State*, 256 S.W.3d 264, 272 (Tex. Crim. App. 2008); *Allen v. State*, 108 S.W.3d 281, 285-87 (Tex. Crim. App. 2003).

permits the arbitrary and capricious imposition of the death penalty, and we are not persuaded to revisit those decisions here.[100]  Point of error forty is overruled.

In his forty-first point of error, appellant claims that Article 37.071 violates the Eighth Amendment to the United States Constitution as interpreted in *Penry II*, 532 U.S. 782 (2001), because the mitigation special issue sends "mixed signals" to the jurors, thereby rendering any verdict intolerable and unreliable.  We have repeatedly rejected similar challenges, and we decline to review our prior decisions on this issue.[101]  Point of error forty-one is overruled.

In his forty-second point of error, appellant claims that the trial court erred in denying his motion to hold that Article 37.071, subsections 2(e) and (f), violate Article I, Sections 10 and 13, of the Texas Constitution, which guarantee that any punishment for an offense will be in accordance with the law.  He asserts that subsections 2(e) and (f), which set forth the jury instructions for the mitigation special issue, are not in accordance with the law and are unconstitutional because they shift the burden of proof to the defendant and essentially reduce the State's burden of proof concerning punishment.  We have previously rejected these claims, and we will not revisit them here.[102]  Point of error forty-two is overruled.

---

[100] *See Woods v. State*, 152 S.W.3d 105, 121 & n.66 (Tex. Crim. App. 2004); *Moore v. State,* 935 S.W.2d 124, 126-28 (Tex. Crim. App. 1996).

[101] *See Woods*, 152 S.W.3d at 121-22; *Saldano v. State*, 232 S.W.3d 77, 107-08 & n.30 (Tex. Crim. App. 2007).

[102] *See Saldano,* 232 S.W.3d at 107-08 & n.30.

In his forty-fourth point of error, appellant claims that the Texas death penalty scheme violated his "rights against cruel and unusual punishment, [his right to] an impartial jury, and [his right] to due process" under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of vague and undefined terms in the jury instructions. Specifically, appellant argues that the terms "probability," "continuing threat to society," and "criminal acts of violence," should have been defined in the jury charge at punishment because these terms "are so vague and indefinite as to be violative of [a]ppellant's fundamental constitutional rights." We have repeatedly rejected these arguments, and we are not persuaded to reconsider them here.[103]  Point of error forty-four is overruled.

In his forty-fifth and forty-sixth points of error, appellant claims that the Texas death penalty scheme is contrary to the United States and Texas Constitutions because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence mitigating against imposition of the death penalty.[104]  Relying on Justice Blackmun's dissent in *Callins v. Collins*, 510 U.S. 1141 (1994), appellant declares that the death penalty scheme is unconstitutional because it fails to adhere to principled guidelines in weighing punishment

---

[103] *See Murphy v. State*, 112 S.W.3d 592, 606 (Tex. Crim. App. 2003).

[104] Appellant makes no separate argument in support of his claim of a state constitutional violation, and so we resolve this claim under the federal constitution only. *See Heitman,* 815 S.W.2d at 690 n.23.

evidence.[105]  This Court has repeatedly rejected this claim, and we are not persuaded to reconsider it.[106]  Points of error forty-five and forty-six are overruled.

In his forty-seventh point of error, appellant claims that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State with regard to aggravating evidence, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  He argues that the mitigation special issue is a conduit for aggravating as well as mitigating factors, and that by instructing jurors to determine whether there are "sufficient" mitigating circumstances, the mitigation issue in effect tells jurors to consider any aggravating factors that may outweigh the mitigating factors.  He reasons that the language of the statute is unconstitutional because it implies that the defense has a burden to disprove aggravating circumstances.

By the time a jury considers the mitigation special issue, jurors cannot increase a defendant's maximum punishment because they have already found him guilty and made an affirmative finding on the future dangerousness special issue.[107]  At that point, the jury has already determined that aggravating circumstances render the defendant eligible for the death

---

[105] Citing *Penry I,* 492 U.S. at 319, he argues further that the "focus upon aggravating circumstances, to the exclusion of mitigating evidence, clearly violates the constitutional mandate of individualized sentencing."  This argument is inapposite because nothing in the record indicates that mitigating evidence was excluded or that the jury was prevented from giving meaningful consideration and effect to any mitigating evidence.

[106] *See Escamilla v. State,* 143 S.W.3d 814, 828 (Tex. Crim. App. 2004).

[107] *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003).

penalty.[108]  Therefore, a trial court does not err in declining to assign the burden on the

mitigation issue to the State.[109]  Point of error forty-seven is overruled.

We affirm the judgment of the trial court.

Delivered: October 20, 2010
Do not publish

---

[108] *Id.*

[109] *Id.; see also Escamilla,* 143 S.W.3d at 828.